**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**AUSTIN DIVISION**

**FILED**

**DEC 1 9 2011**

CLERK, U.S. DISTRICT COURT
WESTERN DISTRICT OF TEXAS
BY_____
                        DEPUTY

**AUTHENTIC BEVERAGES COMPANY, INC.,**
                    **Plaintiff,**

-vs-                                                          **Case No.  A-10-CA-710-SS**

**TEXAS   ALCOHOLIC   BEVERAGE**
**COMMISSION,**
                    **Defendant.**

_____

## O R D E R

BE IT REMEMBERED on November 22, 2011, the Court held a hearing in the above-styled

cause, at which the parties appeared by and through counsel, and at which the Court heard argument

regarding the parties' cross-motions for summary judgment [##33, 36].  Also before the Court were

Plaintiff Authentic Beverages Company, Inc.'s[1] responsive filings [##37, 38].  Having considered

the parties' arguments, and having reviewed the documents, the relevant law, and the file as a whole,

the Court now enters the following opinion and order GRANTING IN PART and DENYING IN

PART both parties' motions for summary judgment.

### Background

The practice of law is often dry, and it is the rare case that presents an issue of genuine

interest to the public.  This is just such a case, however.  Dealing as it does with constitutional

---

[1] Although there are three plaintiffs in this case—Authentic Beverages Company, Inc., Jester King Craft Brewery, L.L.C., and Zax L.L.C.—the Court will refer to them generically as Authentic, except where context requires otherwise. Likewise, although there are several individual defendants sued in their official capacities, the Court will refer to all defendants collectively as Texas Alcoholic Beverage Commission, or TABC.

challenges to the Texas Alcoholic Beverage Code, it is anything but "dry"—and this Court would never be so foolish as to question the sincerity of Texans' interest in beer.

Given this obvious public interest, it is both surprising, and unfortunate for proponents of the Alcoholic Beverage Code, that the State of Texas does not appear to have taken as much of an interest in this case as it might have. Whether the challenged provisions of the Alcoholic Beverage Code could have withstood Authentic's First Amendment challenges under any circumstances is questionable, but under the circumstances of this case—most notably, defense counsel's candid admission in open court that the State submitted virtually no summary judgment evidence regarding some of Authentic's claims[2]—there is no question the Texas Alcoholic Beverage Commission (TABC) has failed to meet its summary judgment burden as to these challenges. Thus, almost by default, the Court grants Authentic's motion for summary judgment on these claims.

In a strange parallel, Authentic offers little evidence in support of its Equal Protection challenges, instead attempting—impermissibly—to shift its evidentiary burden on these claims to TABC. Because Authentic has failed to provide evidence demonstrating a genuine dispute of material fact on its Equal Protection claims, the Court grants TABC's motion for summary judgment as to these challenges.

Finally, the Court grants TABC's motion for summary judgment on Authentic's Commerce Clause claim, because Authentic has failed to demonstrate the burden imposed on commerce is

---

[2] At the risk of belaboring the point, the Court notes TABC's summary judgment evidence spans approximately ninety-five pages, of which about seventy pages are transcripts of depositions of the three Plaintiffs' employees. While this testimony is relevant to TABC's argument that Plaintiffs lack standing, it does nothing to rebut the substance of Plaintiffs' First Amendment challenges. The remaining twenty-five or so pages are divided between an excerpt from the Federal Register (which clearly has little to do with the Texas Alcoholic Beverage Code), bill analyses of limited relevance, and two errata sheets documenting changes to deposition testimony. Notably absent is evidence regarding what substantial government interest is actually advanced by the challenged regulations, or why any such interest could not be advanced through more narrow regulations.

clearly excessive in relation to Texas's legitimate authority to regulate business and protect its citizens through reasonable permitting requirements.

## I.       Texas Alcoholic Beverage Code

A brief description of the three-tier system of the Texas Alcoholic Beverage Code, and mention of some of the Code's major provisions, is helpful to provide context for Authentic's challenges and the Court's discussion.

### A.       Prohibition on "Tied Houses"

Texas law divides the alcohol industry into three levels—manufacturers, wholesalers, and retailers—and forbids "tied houses," meaning "any overlapping ownership or other prohibited relationship between those engaged in the alcoholic beverage industry at different levels." TEX. ALCO. BEV. CODE ANN. § 102.01(a); *see also, e.g., id.* §§ 12.01–06, 19.01–.05, 25.01–.13.  That is, an entity engaged in the alcoholic beverage industry in Texas generally must choose a single level on which to operate, and cannot operate on either of the other two levels.  Thus, for instance, a manufacturer generally cannot also act as a wholesaler or retailer.

### B.       "Beer" and "Ale" or "Malt Liquor"

Texas law also divides malt beverages into two types, based on their alcohol content: "beer," which contains one half percent or more of alcohol by volume, and not more than four percent of alcohol by weight; and "ale" or "malt liquor," which contains more than four percent alcohol by weight.  *Id.* § 1.04(12), (15).  TABC regulations require that all malt beverages be labeled and advertised in accordance with these definitions.  16 TEX. ADMIN. CODE §§ 45.77, 45.90.

## C.    The Code's Uncertain and Inconsistent Definitions

Unfortunately, not all of the Texas Alcoholic Beverage Code is so clear.  One source of complication is the Code's many technical terms, and its lack of consistency in adhering to those terms' precise definitions.

### 1.    "Manufacturers" and "Brewers"

The Code defines a "manufacturer" as a "a person engaged in the manufacture or brewing of beer," TEX. ALCO. BEV. CODE ANN. § 1.04(17), presumably as opposed to a person who makes ale or malt liquor (or some other alcoholic beverage).  In the context of the "tied house" provisions, however, the term "manufacturer" is to be given its plain meaning, "regardless of the specific names given permits under Subtitle A, Title 3, of this code."[3]  *Id.* § 102.01(a).

Further, no specific term for a producer of ale or malt liquor appears in § 1.04, but the permitting provisions of the Code suggest "brewers" produce ale and malt liquor.  *See, e.g., id.* § 12.01 (describing the authorized activities for a holder of a "brewer's permit," including the manufacture of malt liquor).  However, Chapter 102 of the Code, although it initially divides the alcoholic beverage industry into "manufacturers," "wholesalers," and "retailers" (all to be given their ordinary meanings), later departs from those terms, apparently using the term "brewer" generically, perhaps to mean any producer of malt beverages.  *See id.* § 102.07(a) (containing the "tied house" prohibition, forbidding a "person who owns or has an interest in the business of a distiller, brewer, rectifier, wholesaler, class B wholesaler, winery, or wine bottler" from various dealings with retailers or consumers).  Unfortunately, it appears Chapter 102 uses generic, undefined terms in some places,

---

[3] Although § 1.04, containing the statutory definition of the term "manufacturer," does not fall within Subtitle A, Title 3, of the Code, the Court assumes § 102.01 is nevertheless intended to "override" that definition as well.

and precise statutory terms in others.  The parties' briefs appear to use the term "brewer" and "brewery" generally, to refer to any producer of malt beverages.

## 2.   Beers and Liquors and Wines, Oh My!

A second source of potential confusion is the term "liquor," which the Code defines, in part, as "any alcoholic beverage containing alcohol in excess of four percent by weight, unless otherwise indicated." *Id.* § 1.04(5).  The definition goes on: "Proof that an alcoholic beverage is . . . wine, . . . ale, [or] malt liquor . . . is prima facie evidence that it is liquor." *Id.*  This latter sentence seems to suggest that wine, ale, and malt liquor will typically, but not necessarily, be "liquor" under Texas law.  As noted above, however, "ale" and "malt liquor" will, by definition, always contain more than four percent alcohol by weight, *see id.* § 1.04(12), presumably also making them "liquor."  More ambiguously, the Code defines "wine" as "the product obtained from the alcoholic fermentation of juice of sound ripe grapes, fruits, berries, or honey, and includes wine coolers," *id.* § 1.04(7), regardless of the alcohol content of the product.  Indeed, the definition of "wine cooler" explicitly states such a beverage "may have an alcohol content as low as one-half of one percent by volume." *Id.* § 1.04(24).  Thus, it appears some wine and wine coolers may be "liquor," and some may not.

This is not mere quibbling by the Court, because the Alcoholic Beverage Code often regulates alcoholic beverages differently, depending on whether they are "beer" or "liquor."  For instance, the Code requires people to hold certain "permits" if they wish to make, import, distribute, or sell "liquor," whereas "licenses" are required if one wishes to do the same things with "beer."[4] *Id.* §§ 11.01, 61.01.

---

[4] Naturally, the Code is not entirely consistent in this regard, either.  For instance, a "wine and beer retailer's permit" allows the holder to sell wine, beer, and malt liquor with a strength between one half percent and seventeen percent alcohol by volume. *See* TEX. ALCO. BEV. CODE ANN. § 25.01.

Likewise, two of the three levels of the Texas alcoholic beverage industry have different names, depending on which sort of beverage is involved: "brewer" and "wholesaler" in the case of liquor, versus "manufacturer" and "distributor" in the context of beer.  *See generally id.* §§ 12.01–.06, 19.01–.05, 62.01–.14, 64.01–66.11.

These ambiguities are also significant because Texas presumably intended to regulate all alcoholic beverages by requiring those in the industry to hold at least one permit or license. However, it seems possible an alcoholic beverage—such as "wine" or a "wine cooler"—could be neither "beer" nor "liquor," as those terms are defined by the Code,[5] and thus could arguably fall outside the state's permit–license scheme.

## D.    Conclusion

For the sake of clarity, unless otherwise specified, the Court will use the term "producer" generically, to mean a maker of any alcoholic beverage; "manufacturer" to mean a producer of beer; "brewer" to mean a producer of ale or malt liquor; "reseller" as a generic term for those in the middle level of the industry, who purchase alcoholic beverages from producers, and sell them to retailers; "distributor" to mean a reseller of beer; "wholesaler" to mean a reseller of liquor, including ale and malt liquor; and "retailer" generically, to mean a seller of any alcoholic beverage to the ultimate consumer.  The Court will refer to "beer" and "ale" or "malt liquor," collectively, as "malt beverages."  This will occasionally require a departure from the nomenclature in the parties' briefs.[6]

---

[5] Filling this particular gap, but adding uncertainty to the overall regulatory scheme, the Code requires wineries to hold "permits," and not "licenses," without regard to the alcohol content of the particular product. *See id.* § 16.01. Whether this means all "wine" is "liquor," or whether this represents a partial exception to the general rule that permits apply only to liquor, is unclear.

[6] Thankfully, regardless of the words they use, the parties appear to agree on what entities are regulated, and in what ways.  Therefore, the Code's lack of definitional rigor is merely unpleasant, and not dispositive of the Court's resolution of Authentic's challenges.

Obviously, regulation of alcoholic beverages in Texas is complicated and, in many cases, confusing. Rather than attempting to exhaustively describe the Code's regulatory provisions, the Court turns instead to Authentic's specific challenges.

## II.   Authentic's Challenges

As noted above, Authentic challenges some provisions of the Alcoholic Beverage Code under the First Amendment, some under the Equal Protection Clause of the Fourteenth Amendment, and some under the Commerce Clause of Article I, Section 8.

## A.   First Amendment

Authentic brings three challenges to the Code under the First Amendment.  In Authentic's own words, it challenges Texas statutes and regulations that:

> Prohibit breweries and distributors from telling customers where their products can be bought;
>
> Mandate the use of inaccurate statutory definitions of "beer," "ale" and "malt liquor" to describe malt beverages; and
>
> Prohibit advertising the alcoholic content of brewery products and using words in advertising and labeling that suggest alcoholic strength.

Pls.' Mot. Summ. J. [#33] at 1.  The Court briefly addresses the statutes implicated by these challenges.

## 1.   Producers and Resellers Generally Cannot Name Specific Retailers in Advertisements, but Wineries Can

Authentic first challenges the set of laws and regulations that prevent most producers and resellers from advertising the retail locations at which their products can be purchased.   The Alcoholic Beverage Code states, in relevant part: "[N]o person who owns or has an interest in the

business of a . . . brewer [or] wholesaler . . . may . . . furnish, give, or lend any money, service, or thing of value to a retailer." TEX. ALCO. BEV. CODE ANN. § 102.07(a). TABC has promulgated a rule under this statute, which states, in part: "[P]ractices and patterns of conduct that place retailer independence at risk constitute an illegal inducement." 16 TEX. ADMIN. CODE § 45.110(c). The rule further provides examples of illegal inducements, including "providing or purchasing, in whole or in part, any type of advertising benefitting any specific retailer." *Id.* § 45.110(c)(3). Authentic provides evidence—which TABC does not appear to dispute—indicating TABC interprets this rule as prohibiting "any form of advertising by a supplier or wholesaler which draws attention to or promotes a specific retailer or group of retailers." Pls.' Mot. Summ. J. [#33], Ex. 4 at 1. Specifically, this prohibition "includes any form of advertising which lists a retailer's trade name, logo, trademarks, etc." *Id.*

Wineries, by contrast, are exempt from this restriction, *see* TEX. ALCO. BEV. CODE ANN. § 108.09(a) ("Notwithstanding Section 102.07 or any other provision of this code, a winery may include information in the winery's advertising that informs the public of where the winery's products may be purchased."), provided they neither give compensation to, nor receive compensation from, a retailer or wholesaler for such advertisement, *id.* § 108.09(b).

Authentic argues there is no government interest sufficient to justify a restriction on the rights of producers and resellers, to advertise truthful information about where their products may be purchased.

## 2.     The Terms "Beer," "Ale," and "Malt Liquor" Are Misleading

Authentic's second challenge is to the beer–ale dichotomy created by Texas Alcoholic Beverage Code § 1.04(12), (15), and the TABC rules implementing it, some of which are described

above.  Authentic states that, in the alcoholic beverage industry and colloquially, the word "beer" is synonymous with all malt beverages, whereas "ale" stands alongside "lager" as a particular style of beer.  Within the brewing industry, Authentic claims, the term "ale" refers to a beer made via warm fermentation with a certain kind of yeast, irrespective of the finished product's alcohol content.  Thus, Authentic argues, Texas law not only prohibits producers of malt beverages from placing accurate labels on certain products, but also requires them to place affirmatively misleading labels on others, all without sufficient justification.

## 3.    Laws Regulating Statements of Alcohol Content

The last of Authentic's First Amendment challenges is to an array of Texas state regulations related to statements of alcohol content on labels, and in advertising.

Texas law prohibits producers and resellers from making various kinds of advertisement about "brewery products," including any advertisement that "refers to the alcohol content of the product."  TEX. ALCO. BEV. CODE ANN. § 108.01(a).  A related TABC rule further prohibits advertisements containing statements of alcohol content by comparison with other products, as well as use of the words "strong," "full strength," "high proof," or "any other reference to alcoholic content . . . or similar words or statements likely to be considered as statements of alcoholic content." 16 TEX. ADMIN. CODE § 45.79(f).

Meanwhile, it appears the alcohol content of distilled spirits *must* be included in advertisements for those products. *See id.* § 45.13(c) ("The alcoholic content shall be stated by proof for distilled spirits except that it may be stated in percentage by volume of cordials and liqueurs, cocktails, highballs, and such other specialties as may be specified by the administrator.").  Although the Texas Legislature's intent toward wineries is not entirely clear, a TABC rule prohibits wineries

from advertising the alcohol content of their products.[7]  *See id.* § 45.49(a) ("An advertisement shall not contain . . . [a]ny statement of, or any statement likely to be regarded as a statement of, alcoholic content.").

The rules on labeling are quite different, however.  Most notably, TABC rules allow malt beverage labels to contain a statement of alcohol content.  *See id.* § 45.79.  Nevertheless, as in the advertising context, malt beverage labels cannot contain certain words, including "'strong,' 'full strength,' 'extra strength,' 'high proof,' 'prewar strength,' 'full old-time alcoholic strength,' or similar words or statements, likely to be considered as statements of alcoholic content."  *Id.* § 45.82(f).

Authentic argues these rules are inconsistent, nonsensical, and cannot be justified by any substantial government interest.

## B.    Equal Protection

Authentic likewise brings three challenges to the Code under the Equal Protection Clause. Again in its own words, Authentic challenges Texas regulations that:

> Prohibit breweries from selling their products at the point of production while allowing wineries and brewpubs to do so;

> Prohibit brewpubs from selling their products to distributors and retailers while allowing wineries and microbreweries to do so; and

> Treat foreign breweries as the first American source of supply of malt beverages while treating importers as the first American source of supply of wine and distilled spirits.

---

[7] As Authentic notes, the statutory authority for this TABC rule is not obvious.  However, as this rule is not one that is being challenged in this lawsuit, the Court accepts it as valid.

Pls.' Mot. Summ. J. [#33] at 2.  Authentic also challenges the latter regulation under the Commerce Clause.

### 1.   Most Producers of Malt Beverages Cannot Sell at the Point of Production, but Wineries and Brewpubs Can

Despite the general rule prohibiting "tied houses,"[8] Texas law contains exceptions allowing wineries and brewpubs to act as both producers and retailers.

Specifically, Chapter 74 of the Texas Alcoholic Beverage Code governs "brewpub" licenses,[9] and provides that the holder of such a license may not only "manufacture, brew, bottle, can, package, and label malt liquor, ale, and beer," but also may "sell or offer without charge, on the premises of the brewpub, to ultimate consumers for consumption on or off those premises, malt liquor, ale, or beer produced by the holder." TEX. ALCO. BEV. CODE ANN. § 74.01(a).  Brewpubs are also authorized to sell food on their premises.  *Id.*

Likewise, the Code allows holders of a winery permit both to "manufacture, bottle, label, and package wine containing not more than 24 percent alcohol by volume," and to "sell wine to ultimate consumers . . . for consumption on the winery premises . . . or . . . in unbroken packages for off-premises consumption in an amount not to exceed 35,000 gallons annually." *Id.* § 16.01(a).

---

[8] Consistent with this general rule, Texas law does not authorize holders of a brewer's permit or a manufacturer's license to sell products to ultimate consumers. *See id.* §§ 12.01(a), 62.01(a).

[9] Texas law imposes production limits on brewpubs, stating: "The total annual production of malt liquor, ale, and beer by a holder of a brewpub license may not exceed 5,000 barrels for each licensed brewpub established, operated, or maintained by the holder in this state." *Id.* § 74.03.

Although Authentic acknowledges there are differences between these producers of alcoholic beverages, it argues there is no rational basis for Texas's disparate treatment of most malt beverage producers, which are not allowed to sell to retailers at the point of production, and brewpubs and wineries, which are.

## 2.    Brewpubs Cannot Sell to Distributors or Retailers, but Wineries and Microbreweries Can

Although the holder of a Texas brewpub license enjoys the ability to sell its products to ultimate consumers, it is prohibited from selling its products for resale.  *Id.* § 74.01(f).  As a practical matter, this means that, while brewpubs may produce and retail malt beverages,[10] they may not interact with the intermediate wholesaler–distributor level of the alcoholic beverage industry.  By contrast, as noted previously, most malt beverage producers cannot sell their products directly to ultimate consumers, and are thus *required* to sell their products to and through resellers.  *See id.* §§ 12.01(a)(3), 62.01(a).  Wineries enjoy the ability to interact with both wholesalers and consumers.  *See id.* § 16.01(a).

Because brewpubs are authorized, but not required, to sell food, Authentic argues, they are essentially the equivalent of small malt beverage producers.  Thus, Authentic claims, there is no rational basis for treating brewpubs differently than such producers, or wineries.

## 3.    Texas Favors Importation of Wine and Distilled Spirits Over Malt Beverages

Texas law potentially requires out-of-state malt beverage producers to hold three Texas permits and licenses if they wish to have their products imported into, or sold in, Texas.  First, to

---

[10] Technically, the holder of a brewpub license is a "retailer" under Texas's three-tier system. *See id.* § 74.01(d) ("The holder shall be considered a 'retailer' for purposes of Section 102.01 of this code.").

import or sell ale or malt liquor in Texas, an out-of-state producer must hold a nonresident brewer's permit. *See id.* § 13.01. Second, a holder of a nonresident brewer's permits is required also to hold a nonresident seller's permit. *Id.* § 13.03. Third, if the out-of-state producer wishes to import beer into Texas, it must hold a nonresident manufacturer's license. *See id.* § 63.01.

By contrast, only a nonresident seller's permit is required to "ship liquor into this state, or cause it to be shipped into this state, in consummation of sales made to permittees authorized to import liquor into the state." *Id.* § 37.01(a)(2). Wholesalers and, with some limitations, distillers and wineries, are authorized, via their respective permits, to import liquor into Texas. *See id.* §§ 14.01(6), 16.01(3), 16.03, 19.01(a). In fact, Authentic argues, a non-U.S. liquor producer may not require any Texas permit at all, provided it deals with a holder of a Texas nonresident seller's permit.

Authentic argues there is no rational basis for Texas's disparate treatment of producers of malt beverages, and producers of liquor. Authentic further argues these differing requirements create an excessive burden on interstate commerce, and impermissibly encroach on Congress's ability to regulate foreign commerce.

## Analysis

### I.    Summary Judgment — Legal Standard

Summary judgment shall be rendered when the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine dispute as to any material fact and that the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–25 (1986); *Washburn v. Harvey*, 504 F.3d 505, 508 (5th Cir. 2007). A dispute regarding a material fact is "genuine" if the evidence is such that a reasonable jury

could return a verdict in favor of the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). When ruling on a motion for summary judgment, the court is required to view all inferences drawn from the factual record in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 587 (1986); *Washburn*, 504 F.3d at 508. Further, a court "may not make credibility determinations or weigh the evidence" in ruling on a motion for summary judgment. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000); *Anderson*, 477 U.S. at 254–55.

Once the moving party has made an initial showing that there is no evidence to support the nonmoving party's case, the party opposing the motion must come forward with competent summary judgment evidence of the existence of a genuine fact issue. *Matsushita*, 475 U.S. at 586. Mere conclusory allegations are not competent summary judgment evidence, and thus are insufficient to defeat a motion for summary judgment. *Turner v. Baylor Richardson Med. Ctr.*, 476 F.3d 337, 343 (5th Cir. 2007). Unsubstantiated assertions, improbable inferences, and unsupported speculation are not competent summary judgment evidence. *Id.* The party opposing summary judgment is required to identify specific evidence in the record and to articulate the precise manner in which that evidence supports his claim. *Adams v. Travelers Indem. Co. of Conn.*, 465 F.3d 156, 164 (5th Cir. 2006). Rule 56 does not impose a duty on the court to "sift through the record in search of evidence" to support the nonmovant's opposition to the motion for summary judgment. *Id.* "Only disputes over facts that might affect the outcome of the suit under the governing laws will properly preclude the entry of summary judgment." *Anderson*, 477 U.S. at 248. Disputed fact issues that are "irrelevant and unnecessary" will not be considered by a court in ruling on a summary judgment motion. *Id.* If the nonmoving party fails to make a showing sufficient to establish the existence of an element

essential to its case and on which it will bear the burden of proof at trial, summary judgment must be granted. *Celotex*, 477 U.S. at 322–23.

## II.      Authentic's Challenges

## A.      First Amendment

Before considering the merits of Authentic's First Amendment claims, the Court must address TABC's argument that none of the Plaintiffs have standing to bring such challenges to the Texas Alcoholic Beverage Code. For the following reasons, the Court rejects this argument.

## 1.      Standing

## a.      Legal Standard

"Article III of the Constitution confines the federal courts to adjudicating actual 'cases' and 'controversies.'" *Allen v. Wright*, 468 U.S. 737, 750 (1984). "[T]he doctrine of standing serves to identify those disputes which are appropriately resolved through the judicial process." *Whitmore v. Arkansas*, 495 U.S. 149, 155 (1990). As the Supreme Court has explained:

> Standing doctrine embraces several judicially self-imposed limits on the exercise of federal jurisdiction, such as the general prohibition on a litigant's raising another person's legal rights, the rule barring adjudication of generalized grievances more appropriately addressed in the representative branches, and the requirement that a plaintiff's complaint fall within the zone of interests protected by the law invoked.

*Allen*, 468 U.S. at 751. "It is well established . . . that before a federal court can consider the merits of a legal claim, the person seeking to invoke the jurisdiction of the court must establish the requisite standing to sue." *Whitmore*, 495 U.S. at 154.

The "irreducible constitutional minimum of standing" has three elements:

> First, the plaintiff must have suffered an "injury in fact"—an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical. Second, there must be a causal connection

-15-

between the injury and the conduct complained of—the injury has to be fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court. Third, it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.

*Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992) (quotations, citations, and alterations

omitted). The Fifth Circuit has recently summarized these requirements by saying a plaintiff must

show: (1) a concrete and particularized injury in fact that is actual or imminent, not conjectural or

hypothetical; (2) a causal connection between the injury and the conduct alleged; and (3) that the

injury will be redressed by a favorable decision. *McKinley v. Abbott*, 643 F.3d 403, 407 (5th Cir.

2011).

**b.     Application**

TABC argues none of the Plaintiffs have standing to challenge the Alcoholic Beverage Code,

for various reasons.

With respect to distributor Authentic, TABC argues no decision by this Court will redress

an injury to Authentic, because Authentic does not currently have a Texas license to import or

distribute beer, and does not plan to acquire such licenses for the next two years. Moreover, TABC

argues Authentic, as a distributor, is not injured by restrictions on what manufacturers may put on

malt beverage labels. Finally, TABC argues there is no evidence of a concrete injury to Authentic,

because Authentic was unable to identify any specific product it wished to sell that had been

submitted to TABC for approval, but was rejected because of its label.

Second, TABC claims retailer Zax does not satisfy any of the three standing requirements,

because it cannot demonstrate the challenged Code provisions have caused it to suffer any adverse

economic consequences.

Finally, although TABC concedes "a manufacturer would arguably be in the best position to establish its standing to challenge Texas' malt beverage labeling laws," TABC argues manufacturer Jester King lacks standing because it has not encountered an actual or imminent injury. Defs.' Mot. Summ. J. [#36] at 13.  Specifically, TABC first argues Jester King has never submitted a sample product with a label to TABC for approval, and had it rejected.  Second, TABC argues Jester King has failed to demonstrate any injury caused by the Code's requirement that certain malt beverages be labeled "beer," while others must be labeled "ale" or "malt liquor," based on alcohol content rather than style.

The Court finds TABC's standing argument plausible as to Zax.  None of the challenged regulations directly affect Zax, and any indirect effect or injury may indeed be too speculative to satisfy constitutional standing requirements.  Because the Court finds Authentic and Jester King do have standing to bring their First Amendment claims, however, the question of Zax's standing is irrelevant for practical purposes.

Authentic is directly prohibited by the Code from advertising either the alcohol content of its products, or where those products are sold.  Although Authentic lacks a license to import or distribute "beer" in Texas, it retains its license to import "ale" or "malt liquor," in addition to wine and distilled spirits.  *Id.*, Ex. 1 at 46:13–49:1.  Accordingly, it is still directly affected by its inability to import into Texas any beverage that is "ale" or "malt liquor," under Texas law, but may not bear those designations on its label.

More obviously, Jester King has standing to bring the First Amendment claims in this case. As a manufacturer, Jester King is directly affected by all of the challenged regulations.  Further, the Court rejects TABC's argument that Jester King has failed to demonstrate an injury because it has

-17-

never submitted, and had rejected, a label for one of its products.

Although a plaintiff generally must submit to a policy in order to have standing to challenge its constitutionality, "[t]his threshold requirement for standing may be excused . . . when a plaintiff makes a substantial showing that application for the benefit would have been futile." *Ellison v. Connor*, 153 F.3d 247, 254–55 (5th Cir. 1998) (quotation and alteration omitted). Likewise, "it is not necessary that [a plaintiff] first expose himself to actual arrest or prosecution to be entitled to challenge a statute that he claims deters the exercise of his constitutional rights." *Steffel v. Thompson*, 415 U.S. 452, 459 (1974).

Here, TABC has not suggested Jester King has misinterpreted any of the relevant regulations, or given even the merest hint those regulations would not be enforced. Under these circumstances, it would make a mockery of standing doctrine to require Jester King to go through the meaningless motions of submitting a label to TABC, only to have it inevitably rejected, before it could bring this lawsuit.

**c.      Conclusion — Standing**

Because the Court finds Authentic and Jester King both have standing to bring the First Amendment challenges in this case, the Court declines to dismiss these claims, and need not definitively resolve the question of Zax's standing.

**2.      Merits**

**a.      Legal Standard**

The parties agree the speech at issue here is commercial speech, and thus Texas's alcohol regulation scheme should be analyzed under the framework articulated by the Supreme Court in *Central Hudson Gas & Electric Corp. v. Public Service Commission*, 447 U.S. 557 (1980):

In commercial speech cases, then, a four-part analysis has developed. At the outset, we must determine whether the expression is protected by the First Amendment. For commercial speech to come within that provision, it at least must concern lawful activity and not be misleading. Next, we ask whether the asserted governmental interest is substantial. If both inquiries yield positive answers, we must determine whether the regulation directly advances the governmental interest asserted, and whether it is not more extensive than is necessary to serve that interest.

*Central Hudson*, 447 U.S. at 566.

"The party seeking to uphold a restriction on commercial speech carries the burden of justifying it." *Bolger v. Youngs Drug Prods. Corp.*, 463 U.S. 60, 71 n.20 (1983). "There is certainly some difference between compelled speech and compelled silence, but in the context of protected speech, the difference is without constitutional significance, for the First Amendment guarantees 'freedom of speech,' a term necessarily comprising the decision of both what to say and what not to say." *Riley v. Nat'l Fed'n of the Blind of N.C., Inc.*, 487 U.S. 781, 796–97 (1988).

**b.    Application**

At the outset, it is obvious the sale of alcohol, and the advertisement thereof, is legal. Indeed, as TABC notes: "The Supreme Court of the United States has, on many instances, maintained these products fall under the purview of commercial speech and its consequent protections." Defs.' Mot. Summ. J. [#36] at 15.

A second threshold question is whether the speech the Code prohibits, and which Authentic wishes to engage in, is misleading, and therefore outside the protections of the First Amendment. The Court concludes Authentic's desired speech is not misleading, and is therefore entitled to First Amendment protection.

In a remarkable (though logically dubious) demonstration of circular reasoning—a tactic it repeats throughout its briefing, and which it echoed in open court—TABC attempts to defend the

constitutional legitimacy of the Code through an appeal to the statutory authority of the Code itself.

Specifically, TABC argues that referring to a malt beverage that contains between 0.5 alcohol by

volume (ABV) and 4% alcohol by weight (ABW), by any name other than "beer," is inherently

misleading in Texas; likewise with any reference in Texas to a malt beverage containing more than

4% ABW, as anything other than "ale" or "malt liquor."  More generally, TABC argues the Code

supplies the *only* non-misleading way of referring to alcoholic beverages in Texas.

> The Court rejected this exact argument in its December 22, 2010 Order in this case, stating:

> Taken at face value, TABC's argument suggests commercial speech is only protected
> by the United States Constitution if it parrots Texas state law; this proposition
> reflects a degree of Texas pride that, while laudable under most circumstances, must
> in this case be considered legally dubious.

> The Court acknowledges there may be some areas in which TABC's
> argument is valid. For instance, where commercial speech concerns a legal concept
> or uses a legal term of art, deviation from the relevant legal definition may indeed be
> false, deceptive, or misleading. That is not the case here, however. The terms "beer,"
> "ale," and "malt liquor" are common terms used in everyday conversation. The Court
> doubts many people would feel misled or deceived if they were offered a "beer" and
> subsequently discovered that it was technically an "ale" under Texas law because it
> contained 4.1% alcohol by weight.

Order [#18] at 7–8.  The Court once again rejects TABC's argument.

First, the Court reiterates its disbelief that Texas's choice of statutory definitions and

nomenclature wholly precludes First Amendment review under the commercial speech doctrine.

Such a per se rule is particularly inappropriate where, as here, the statutory nomenclature is itself

inconsistent and imprecise.

Second, TABC's argument, combined with artful legislative drafting, could be used to justify

any restriction on commercial speech.  For instance, Texas would likely face no (legal) obstacle if

it wished to pass a law defining the word "milk" to mean "a nocturnal flying mammal that eats

insects and employs echolocation." Under TABC's logic, Texas would then be authorized not only to prohibit use of the word "milk" by producers of a certain liquid dairy product, but also to require Austin promoters to advertise the famous annual "Milk Festival" on the Congress Avenue bridge. Regardless of one's feelings about milk or bats, this result is inconsistent with the guarantees of the First Amendment.

Finally, the Supreme Court's guidance in *Central Hudson* persuades the Court that Authentic's desired speech is consistent with the purpose of the First Amendment's protection of commercial speech:

> Commercial expression not only serves the economic interest of the speaker, but also assists consumers and furthers the societal interest in the fullest possible dissemination of information. In applying the First Amendment to this area, we have rejected the highly paternalistic view that government has complete power to suppress or regulate commercial speech. People will perceive their own best interests if only they are well enough informed, and the best means to that end is to open the channels of communication rather than to close them. Even when advertising communicates only an incomplete version of the relevant facts, the First Amendment presumes that some accurate information is better than no information at all.

*Central Hudson*, 447 U.S. at 561–62 (quotations, citations, and alteration omitted).

At best, Authentic's proposed speech is accurate, and Texas's nomenclature is simply inconsistent with common understanding. At worst, Authentic's proposed speech is an incomplete version of the relevant facts, as are Texas's statutory definitions. In either case, Authentic's proposed speech is entitled to First Amendment protection.

Having determined the regulations at issue in this case are subject to First Amendment scrutiny under *Central Hudson*, the Court now addresses whether TABC has met its burden of justifying each set of regulations by: (1) articulating a substantial government interest; (2) demonstrating the regulations directly advance that interest; and (3) showing the regulations are not

more extensive than necessary to advance the interest. Largely because of TABC's failure to address Authentic's arguments, and its failure to submit evidence in defense of the Code, the Court concludes TABC has failed to meet its burden.

i.    **Authentic's Third Challenge**

Because it is the most easily disposed of, the Court begins its discussion with Authentic's challenge to the Code's regulation of statements of alcohol content on labels, and in advertising. TABC fails to respond to this challenge in any way, be it through evidence, or even mere argument. It thus goes without saying TABC has failed to articulate any substantial government interest, demonstrate the regulations directly advance this interest, or show the regulations are not more extensive than necessary to advance the interest. TABC has therefore failed to meet its summary judgment burden, and Authentic is entitled to judgment as a matter of law.

Although TABC's failure to respond compels the Court to grant summary judgment in favor of Authentic on this claim, the Court notes Authentic's argument is not frivolous. Indeed, it is difficult to articulate a substantial government interest that forbids advertisement of wine and malt beverages by reference to alcohol content; seems to require advertisement of the alcohol content of distilled spirits; permits inclusion of alcohol content information on labels; but forbids the use of certain terms in doing so. The most obvious potential interest, informing consumers about the strength of alcoholic beverages, is clearly inadequate, because these regulations frustrate this interest as much as they advance it.

In any case, the Court is in no position to speculate about the interest, if any, advanced by these regulations, much less how directly the regulations advance such an interest, or about the "fit" between the interest and the regulations. Indeed, that was TABC's responsibility—one it has

apparently abdicated in this case.

## ii.   Authentic's First Challenge

With respect to Authentic's challenge to the Code's regulations, preventing malt beverage producers and resellers from advertising which retailers sell their products, the Court again finds TABC has failed to meet its summary judgment burden.

Although TABC provides some response, its argument on this point is anemic, and unsupported by any relevant evidence.  Indeed, ignoring TABC's characterization of Authentic's position, the entirety of TABC's argument is as follows:

> [I]t is important to consider three things: 1) once a product is in the possession of a retailer, it is the retailer's product, and no longer the manufacturer or distributor's product; 2) allowing manufacturers and distributors to identify particular retail outlets to consumers is clearly conferring on the retailer a benefit or thing of value, which implicates vertical integration; and, 3) there is no alleged prohibition on retailers regarding advertising the brands of products it sells.

Defs.' Mot. Summ. J. [#36] at 22.

From this, the Court infers TABC is advancing "prevention of vertical integration" as the substantial government interest furthered by these regulations.  It is possible TABC's third point is intended to demonstrate that the regulations are not more extensive than necessary to advance this interest.  The first point, though it may be semantically accurate, seems analytically irrelevant.  The fact the Court is left to guess at what TABC means is sufficient to conclude it has failed to meet its summary judgment burden on this issue.

Even on its own terms, however, TABC's argument fails.  While prevention of vertical

-23-

integration may well be a substantial government interest,[11] a restriction on the free speech rights of

producers and resellers cannot be justified by pointing out that retailers are free to speak their minds.

Nor does the existence of a substantial government interest justify the imposition of any restriction

on speech the government deems appropriate; in the commercial speech context, such a restriction

must directly advance the interest, and be no more extensive than necessary to do so.  TABC offers

neither argument nor evidence on these issues.[12]

The Court thus grants Authentic's motion for summary judgment on this claim.

**iii.    Authentic's Second Challenge**

With the exception of its standing argument, TABC devotes most of its argument (though

still little in the way of evidence) to this challenge.  Nevertheless, the Court concludes TABC has

failed to meet its summary judgment burden on this claim.

Charitably, TABC actually lists several government interests allegedly advanced by the

Code's beer–ale distinction:

(1.) The labeling requirement provides a clear distinction to consumers as to the
lower alcohol content "beer" versus a product that contains a higher level of alcohol
and is, therefore, not labeled as "beer." It is a simple system that protects both those
who know the technical percentage of alcohol definition of "beer" and those merely
familiar with the products labeled "beer."

(2.) The labeling requirement provides on-premises service providers with an instant

---

[11] Although unquestionably true when the Code was first written, and the evils of organized crime's involvement in the alcoholic beverage industry were both immediate and substantial, it is less clear that vertical integration of the alcoholic beverage industry still poses a grave threat to Texas's interests.  In any case, in light of wineries' exemption from these regulations, this purported interest is suspect.

[12] Indeed, TABC represented during the hearing that even a passive website, maintained by a producer or reseller, and listing the retail locations at which their products may be purchased, would violate the Code.  It appears to the Court that the value to retailers of such a list—which, after all, would only be read by those actively seeking it out—would be minimal, and would thus scarcely raise the specter of vertical integration.  Balanced against the consumer's right to accurate commercial information, and the producer or reseller's right to dispense such information, the Court thinks the Code reaches too far.

ability to monitor alcohol consumption of patrons by easily being able to distinguish between higher and lower alcohol content malt beverages and thus comply with Texas laws prohibiting sales to intoxicated persons;

(3.) The labeling requirement is essential to the State's goal of allowing flexibility to local communities who, under the wet-dry laws of the State are currently able to authorize the sale of beer only.

*Id.* at 17.  The Court is willing to assume, for the sake of argument, that these are all substantial government interests.

TABC has failed to demonstrate, through either evidence or argument, that the beer–ale dichotomy directly advances any of these interests or, more obviously, that the regulations at issue are not more extensive than necessary to do so.

With respect to the direct advancement requirement, there is no question the beer–ale labeling and advertising requirements are better than nothing in terms of advancing TABC's proposed interests.  However, "better than nothing" is not the standard required by the First Amendment, and these regulations cannot be said to "directly advance" the interests identified by TABC.

Most importantly, the beer–ale distinction is simply not that good at conveying information about the alcohol content of malt beverages.  Evidence provided by TABC indicates the weighted average of the alcohol content of the twenty most popular beers (using the common meaning of that term), based on 2004 sales data, is approximately 3.8% ABW.  *Id.*, Ex. 4 at 41864.  Although TABC argues this figure is "directly in line with Texas' definition of 'beer,'" *Id.* at 20, the evidence is not persuasive, for three reasons.

First, at best, this evidence simply demonstrates that Texas's chosen nomenclature is not affirmatively misleading.  Although this is surely a prerequisite for any compelled speech to survive

constitutional scrutiny,[13] the truthfulness or accuracy of a compelled statement does not insulate such compulsion from review, nor alleviate the government's burden of demonstrating that its regulations comport with the requirements of the First Amendment.  Thus, although TABC's evidence suggests it is appropriate for the Court to conduct a constitutional inquiry into the challenged regulations, it does little or nothing to satisfy that inquiry.

Second, as a weighted average, the 3.8% figure tells the Court relatively little about the actual distribution of the twenty data points around the 4% dividing line: all could be less than 4%, or some could lie on each side of the line.  Indeed, as the figure appears to represent a weighted average based on sales volume, it could even be the case that most of the twenty beers fall on the "ale" side of the line, but those on the "beer" side sell significantly better, thus reducing the average to 3.8%.

Third, although 3.8% ABW is within the mandated statutory range for "beer" in Texas, it is at the very top of that range.  As a practical matter, this not only raises the likelihood that some of the twenty beers actually fall on the "ale" side of the line, but also suggests the beer–ale distinction gives little meaningful information about alcohol content to malt beverage consumers or providers. In fact, this evidence could be taken to mean that "beer" in Texas typically means, "a malt beverage with an alcohol content probably a little less than 4% ABW, but potentially as low as 0.5% ABV"; and "ale" means "a malt beverage with an alcohol content probably a little greater than 4% ABW, but potentially much greater."  If, as TABC asserts, Texas wishes to allow consumers and providers to monitor alcohol consumption by themselves and those they serve, these two categories are not

---

[13] Indeed, it is disturbing to entertain the notion the government could have *any* constitutionally sound interest in forcing its citizens to make false or misleading statements.

especially helpful.[14]

Turning to the question of whether TABC has shown that the challenged regulations are no more extensive than necessary to advance the identified interests, the Court concludes TABC has failed to do so.

Although the burden on this point lies with TABC, Authentic has nevertheless suggested an alternative regulation, which Authentic claims is less restrictive than the Code, yet at least equally effective at advancing TABC's articulated government interests. In particular, Authentic suggests an alternative regulation that allows malt beverage producers to either (1) comply with the Code as it is currently written; or (2) include a conspicuous statement of alcohol content on the beverage's label.

By definition, this regulation is less restrictive than the Code: it allows all options currently available under the Code, and adds more. The only reasonably arguable point is whether Authentic's proposed regulation is sufficient to advance TABC's articulated interests. The Court concludes it is.

To the extent TABC attempts to justify the Code's beer–ale distinction by reference to Texas's substantial interest in informing consumers, providers, and local governments about the alcohol content of malt beverages, there can be little question an actual statement of alcohol content serves this interest better than two rough categories—which, as the Court has already mentioned,

---

[14] Another example of TABC's circular reasoning can be found in its third purported substantial government interest, allowing local communities to authorize the sale of beer only. The beer–ale distinction "directly advances" this interest only in the (pleasantly surprising) sense that these particular Code provisions adhere to, and use, the Code's statutory definitions. Local communities are presumably capable of regulating the sale of malt beverages based upon strength, regardless of what those beverages are called, provided the communities are given some means of determining alcohol content. Put another way, TABC cannot justify the Code simply by pointing to ways in which it is internally consistent.

potentially conceal as much information as they provide.[15]

> TABC's argument to the contrary is almost insulting in its estimation of the Texas public:
>
> It may, indeed, be the case that the public is not keenly aware that the label classifications of "beer" and "ale" or "malt liquor" center on the 4% alcohol by weight mark. If this is the case, though, then the public would also be unaware of the meaning of a statement of percentage alcohol content on labels.

Defs.' Mot. Summ. J. [#36] at 19.

Reading these words literally, TABC appears to advance the laughable argument that, if members of the public are unaware of obscure legal definitions, they are necessarily also unable to compare numbers. Even interpreting this argument more charitably, as meaning that percentages of alcohol content are essentially meaningless to the public in the abstract, it fails.

Although a typical member of the public may not be able, off the cuff, to state the average alcohol content of popular Texas malt beverages, the Court is confident that same person could, if presented with the alcohol content of a variety of malt beverages, come to a reasonably quick and accurate conclusion regarding their average range. Having determined the average range, this person could then make an intelligent choice whether to deviate from that range, in which direction, and by how much. The Court simply does not share TABC's apparently low estimation of Texans, and remains steadfast in its belief that they are capable of basic math.

Absent an explicit disclosure of alcohol content, by contrast, a person sampling a variety of Texas "beers" and "ales" might come to the general conclusion that ales are stronger than beers, but would be unable to determine much else. In particular, this person would be unable to predict, when

---

[15] That is, one person drinking a "beer" may be consuming over eight times as much alcohol as another person, who is also drinking a "beer." Because there is no statutory upper alcohol content limit in the definition of "ale," the theoretical disparity in potency is even greater (although, practically speaking, it is unlikely to be as large).

deciding whether to purchase or drink an unknown "beer" or "ale," whether it was a strong or weak member of its class.

At the end of the day, however, TABC has failed to meet its summary judgment burden because it has not demonstrated, with record evidence, that the Code's beer–ale distinction is no more extensive than necessary to advance any substantial government interest. Even focusing solely on TABC's arguments—which, the Court is forced to once again note, do not constitute competent summary judgment evidence—they fail to address either: (1) why Authentic's proposed regulation does not advance the identified government interests as well as the Code does; or (2) why, in the abstract, the Code is no more extensive than necessary to advance those interests. Accordingly, Authentic is entitled to judgment as a matter of law on this claim.

**3.     Conclusion — First Amendment Challenges**

There may well be one or more substantial government interests that are directly advanced by the Code, and the advancement of which are impossible via a less extensive set of regulations. However, this Court is obligated to make these determinations based upon the competent record evidence presented by the parties. Regrettably, TABC has almost wholly failed to submit such evidence, and has often failed even to respond to Authentic's arguments. Whether this failure reflects a tactical error, laziness, an implicit concession that the Code cannot withstand constitutional scrutiny, an erroneous assumption that TABC is entitled to special treatment, or a mere oversight, the Court cannot say. However, under the circumstances here, the Court is obligated to grant summary judgment in favor of Authentic on its First Amendment challenges.

B.    **Equal Protection**

1.    **Legal Standard**

"Unless a statute provokes 'strict judicial scrutiny' because it interferes with a 'fundamental right' or discriminates against a 'suspect class,' it will ordinarily survive an equal protection attack so long as the challenged classification is rationally related to a legitimate governmental purpose." *Kadrmas v. Dickinson Pub. Sch.*, 487 U.S. 450, 457–58 (1988). Indeed, "a classification neither involving fundamental rights nor proceeding along suspect lines is accorded a strong presumption of validity." *Heller v. Doe*, 509 U.S. 312, 319 (1993). "[E]qual protection is not a license for courts to judge the wisdom, fairness, or logic of legislative choices." *F.C.C. v. Beach Commc'ns, Inc.*, 508 U.S. 307, 313 (1993).

"Further, a legislature that creates these categories need not actually articulate at any time the purpose or rationale supporting its classification. Instead, a classification must be upheld against equal protection challenge if there is any reasonably conceivable state of facts that could provide a rational basis for the classification." *Heller*, 509 U.S. at 320 (quotations and citations omitted).

"A State, moreover, has no obligation to produce evidence to sustain the rationality of a statutory classification. . . . A statute is presumed constitutional, and the burden is on the one attacking the legislative arrangement to negative every conceivable basis which might support it, whether or not the basis has a foundation in the record." *Id.* at 320–21 (citation and quotation omitted). "Finally, courts are compelled under rational-basis review to accept a legislature's generalizations even when there is an imperfect fit between means and ends." *Id.* at 321.

2.    **Application**

As the cases quoted above indicate, with respect to the burden of proof, Authentic's Equal

Protection challenges are the mirror image of their First Amendment challenges.  That is, while TABC had the burden of justifying, with evidence and argument, the Code's speech-based regulations, Authentic bears the burden of demonstrating there is no reasonably conceivable basis which might support the classifications in the challenged sections of the Code.

More specifically, to the extent the Code: (1) treats brewpubs, other malt beverage producers, wineries, and distillers differently; (2) subjects nonresidents to more stringent standards than residents; or (3) both, Authentic must come forward with competent summary judgment evidence demonstrating the disparate treatment either furthers no legitimate government purpose, or is not rationally related to that purpose.  Authentic has failed to do so.

Nor must the Court spend much time analyzing Authentic's claims, because it does not even attempt to carry its burden on these challenges.  Instead, it attempts to shift its burden to TABC:

> Although the State may start with a presumption that an economic regulation not directed as speech is constitutional, when its own . . . witness and the administrator of the agency charged with enforcing its laws cannot explain the state's irrational discrimination, the state's law fails even the rational basis standard of review.

Pls.' Mot. Summ. J. [#33] at 19.

However, as noted above, the state need not come forward with any record evidence whatsoever in defense of the Code.  Further, just because particular individuals within the Texas government—even those of high rank within the administrative agency that enforces the law—may not be able to articulate a reason for the Code's disparate treatment, that does not mean no reason exists.  Indeed, although it may well be desirable, there is no constitutional requirement that a person

who enforces of a law must also know the legislative purpose behind it.[16]

More to the point, however, Authentic's argument is simply inconsistent with Supreme Court case law, as quoted above. The burden is on Authentic to dream up possible rational bases for the Code's classifications and varied regulations, and to present evidence negating them. Of course, Authentic's burden is not literally to negate every *conceivable* basis for the Code's regulations, but at least to confront the plausible ones. Here, Authentic has made no attempt to do so, despite the myriad differences between malt beverages, wine, and distilled spirits; the producers, resellers, retailers, and consumers thereof; and the advertising, marketing, and overall business requirements peculiar to each. In the absence of any such attempt by Authentic, the Court declines to place upon TABC any obligation to identify any legislative purposes behind the challenged provisions of the Code.[17]

Because Authentic has failed to present sufficient evidence in support of its Equal Protection claims, it is clearly not entitled to judgment as a matter of law. It further appears TABC is entitled to such judgment, by reason of its cross-motion, and because of Authentic's failure to meet its evidentiary burden. Accordingly, the Court grants summary judgment in favor of TABC on Authentic's Equal Protection claims.

---

[16] This is good news for fans of ordered society, because in many cases it is impossible to determine the legislative purpose behind the passage of a particular law. In fact, the very concept of a single "legislative purpose," animating the creation and adoption of a statute, is a legal fiction in a representative government, under which lawmaking is more about negotiation and compromise than the expression of a uniform legislative imperative.

[17] An examination of the alternative conclusion demonstrates the inconsistency between Authentic's position and Supreme Court precedent. If this Court accepted Authentic's argument, and required TABC to present some witness who could identify one or more reasons for the Code's classifications, Authentic would no doubt argue it need only overcome those specific reasons to prevail in its challenges—after all, those are TABC's "official" reasons. However, this result directly contradicts *Heller*'s mandate, that a state "has no obligation to produce evidence to sustain the rationality of a statutory classification," to say nothing of its far more powerful statement, that "the burden is on the one attacking the legislative arrangement to negative every conceivable basis which might support it, whether or not the basis has a foundation in the record." *Heller v. Doe*, 509 U.S. 312, 320–21 (1993).

**C.      Commerce Clause**

Authentic challenges the Code's disparate treatment of residents and nonresidents, and its less favorable treatment of foreign malt beverage producers, under the Commerce Clause.

**1.      Legal Standard**

"Though phrased as a grant of regulatory power to Congress, the [Commerce] Clause has long been understood to have a 'negative' aspect that denies the States the power unjustifiably to discriminate against or burden the interstate flow of articles of commerce." *Or. Waste Sys., Inc. v. Dep't of Envtl. Quality*, 511 U.S. 93, 98 (1994). "[T]he first step in analyzing any law subject to judicial scrutiny under the negative Commerce Clause is to determine whether it regulates evenhandedly with only 'incidental' effects on interstate commerce, or discriminates against interstate commerce." *Id.* at 99 (quotation omitted).

"If a restriction on commerce is discriminatory, it is virtually *per se* invalid. By contrast, nondiscriminatory regulations that have only incidental effects on interstate commerce are valid unless the burden imposed on such commerce is clearly excessive in relation to the putative local benefits." *Id.* (quotation omitted). "As we use the term here, 'discrimination' simply means differential treatment of in-state and out-of-state economic interests that benefits the former and burdens the latter." *Id.* at 99.

"[I]n the context of the Foreign Commerce Clause, . . . nondiscriminatory state regulations affecting foreign commerce are invalid if they (1) create a substantial risk of conflicts with foreign governments; or (2) undermine the ability of the federal government to 'speak with one voice' in regulating commercial affairs with foreign states." *Piazza's Seafood World, LLC v. Odom*, 448 F.3d 744, 750 (5th Cir. 2006).

## 2.    Application

Here, the regulations at issue are nondiscriminatory—the Code requires permits and licenses for both residents and nonresidents.  That the Code may sometimes require nonresidents to hold *more* permits than a similarly-situated resident is, in this Court's judgment, and based upon this (mostly silent) evidentiary record, no more than an incidental burden on interstate or foreign commerce.

Likewise, the record contains insufficient evidence for the Court to conclude the burden, if any, imposed by the Code's disparate resident and nonresident permitting and licensure requirements, is either: (1) clearly excessive in relation to Texas's legitimate authority to regulate business and protect its citizens; or (2) sufficient to create a substantial risk of conflict with foreign governments, or undermine Congress's ability to regulate commercial affairs with foreign states. Authentic's motion for summary judgment is therefore denied on this claim.

The Code may indeed be different from federal law, but unless the differences are such that the Code creates a burden on commerce sufficient to satisfy one of the two requirements listed above, the Code is not unconstitutional under the Commerce Clause.  Because Authentic has failed to demonstrate the Code creates such a burden, and because TABC cross-moves for summary judgment, the Court grants summary judgment in favor of TABC on this claim.

## D.    Relief

Rather than invalidating of the challenged provisions in their entireties, the Court finds the following, more narrow, relief is warranted.

With respect to Authentic's first First Amendment challenge, the Court treads carefully. There is no question Texas is entitled to prevent undue collusion between producers and retailers,

and the Court has no intention of disturbing that basic framework.  However, provided there is no financial remuneration, incentive, inducement, or compensation between producers and retailers, the Court concludes Texas Administrative Code, Title 16, Section 45.110(c)(3) is an unconstitutional restriction on the free speech rights of producers, and is accordingly severed from the remainder of that section.  Within this limitation, however, nothing in this opinion should be construed as preventing Texas or TABC from prohibiting, through appropriate statute or regulation, any undue collusion, financial or otherwise, between producers and retailers.

With respect to Authentic's second challenge, the Court is left with only one option, short of rewriting the law, which it is not authorized to do.  Although the Code is free to define "beer" and "ale" as it sees fit, Texas may not compel malt beverage producers to use those terms, and only those terms, in advertising and labeling.  Accordingly, all statutes and regulations that compel such speech, including Texas Administrative Code, Title 16, Sections 45.77 and 45.90, are declared unconstitutional.  Again, nothing prevents Texas or TABC from passing appropriate regulations requiring producers to include accurate statements about the alcohol content of their products in labeling or advertising; absent a constitutionally sound justification, however, Texas may not dictate the exact words producers must use to do so.

Finally, the Court turns to Authentic's third challenge.  Because of TABC's complete failure to address Authentic's arguments on this issue, the Court is left with no guidance regarding the constitutionally sound scope of these provisions, if any.  Accordingly, the Court declares unconstitutional, in their entireties, Texas Alcoholic Beverage Code Section 108.01(a)(4), and Texas Administrative Code, Title 16, Sections 45.79(f) and 45.82(f).

**Conclusion**

The Court is shocked and dismayed at the Texas Attorney General's halfhearted conduct in this case. The very purpose of having the Attorney General's Office defend suits like this, is so the State of Texas can vigorously defend its duly enacted legislative mandates. Here, however, when TABC responded to Authentic's challenges at all, it responded with little in the way of argument, and even less in the way of relevant evidence. The State of Texas is lucky the burden of proof was on Authentic for many of its claims, or else the Alcoholic Beverage Code might have fared even worse than it has.

The Court is not satisfied that the Texas Alcoholic Beverage Code got the defense it deserved, but, in light of the parties' cross-motions for summary judgment, and based upon the record and the briefing in this case, the Court must grant Authentic's motion for summary judgment with respect to its First Amendment claims, and grant TABC's motion for summary judgment with respect to all other claims.

Accordingly,

IT IS ORDERED that Plaintiffs' Motion for Summary Judgment [#33] is GRANTED IN PART and DENIED IN PART, as described above in this opinion;

IT IS FURTHER ORDERED that Defendants' Motion for Summary Judgment [#36] is GRANTED IN PART and DENIED IN PART, as described above in this opinion;

IT IS FURTHER ORDERED, ADJUDGED, and DECREED that Texas Alcoholic Beverage Code Section 108.01(a)(4) is an unconstitutional restriction on free speech, in violation of the First Amendment;

IT IS FURTHER ORDERED, ADJUDGED, and DECREED that Texas

-36-

Administrative Code, Title 16, Sections 45.77, 45.79(f), 45.82(f), 45.90, and 45.110(c)(3) are unconstitutional restrictions on free speech, in violation of the First Amendment;

IT IS FINALLY ORDERED, ADJUDGED, and DECREED that Defendants are ENJOINED from enforcing any of the above-listed unconstitutional regulations, or any other provision of Texas law inconsistent with this opinion.

SIGNED this the ___19th___ day of December 2011.

SAM SPARKS
UNITED STATES DISTRICT JUDGE